HENRY M. BAYARD, PLAINTIFF IN ERROR, v. ISRAEL LOMBARD AND
CHARLES O. WHITMORE.

Where land was sold under an execution, and the money arising therefrom about to be distributed amongst creditors by an order of the Circuit Court, a controversy between the creditors as to the priority of their respective judgments cannot be brought to this court, either by appeal or writ of error.

Although the State in which the judgment was given allowed appeals, by statute, in similar cases arising in the courts of the State, yet it does not follow from the adoption of the forms of process in execution that the courts of the United States adopted the modes of reviewing the decisions of inferior courts.

An appeal to this court is given in chancery cases alone.

Nor is the case a proper one for a writ of error. Such a writ cannot be sued out by persons who are not parties to the record, in a matter arising after execution, by strangers to the judgment and proceedings, and where the error assigned is in an order of the court disposing of certain funds in their possession accidentally connected with the record.

The creditors should have filed their bill in equity, or stated an issue in due legal form, with proper parties, setting forth the merits of their respective claims, in order to lay the foundation for an appeal or writ of error to this court.

THIS case was brought up, by writ of error, from the Circuit Court of the United States for the Eastern District of Pennsylvania.

On the 25th of July, 1845, a judgment was entered on a bond and warrant of attorney, given by Henry M. Bayard to Israel Lombard and Charles O. Whitmore, in the Circuit Court of the United States for the Eastern District of Pennsylvania,

upon which a writ of *fieri facias* was issued, returnable to April session, 1846, which was returned by the marshal for that district as levied on certain tracts of land, the property of the said Henry M. Bayard, in the County of Lancaster, in said district, and which were condemned by the inquisition returned with said writ as not of a clear yearly value beyond all reprises sufficient within the space of seven years to satisfy the debt and damages in the said writ mentioned.

A writ of *venditioni exponas* was issued, returnable to April session, 1847, upon which the said tracts of land were sold to Ann Caroline Bayard for the sum of $ 61,200; of which the sum of $ 60,333.80, being the net amount, after deducting commissions and costs, was agreed to be considered as paid into court.

Upon a motion made on behalf of the Dauphin Deposit Bank, to take out of court the amount of the judgment recovered, on the 28th of August, 1845, by the said bank against the said Henry M. Bayard, in the District Court for the County of Lancaster, for $ 2,500, James Hepburn, Esquire, was appointed by the court, on the 7th of June, 1847, auditor, to report who are entitled to the moneys so considered as in court, who, on the 20th of September, 1847, filed his report, which directed that the judgments against the said Henry M. Bayard be paid according to their priority, without regard to the court in which they were recovered.

As this report examines a point of great interest to the profession throughout the United States, namely, the extent of the lien upon real estate which is created by a judgment in the Circuit Courts of the United States, and as the report was confirmed by the Circuit Court of the Eastern District of Pennsylvania, it is thought proper to insert it.

" To the Honorable, the Judges of the Circuit Court of the United States for the Eastern District of Pennsylvania.

" The undersigned, the auditor appointed by your honorable court, as per certificate annexed, marked A, with instructions to report who are entitled to the moneys in the said certificate mentioned, as being in court, by the agreement of the parties claiming the same, secured by a sale of the property of the defendant, situated in Lancaster County, Pennsylvania, by an execution directed to the marshal of this district, in the suit of Lombard and Whitmore *v.* Henry M. Bayard, in this court, respectfully reports : —

" That he gave notice to all persons interested in the matter referred to him, by advertisements published for three weeks in the 'Democratic Union' at Harrisburg, and in the 'Pennsyl-

vanian ' at Philadelphia, as directed by the order of court, stated in the said certificate, and as will appear from schedule B, hereto annexed ; and that he was attended at the time and place in the said advertisements mentioned, and at the several adjournments of the case, by John M. Read, Esq., who appeared for Lombard and Whitmore, for the use of Haldeman and McCormick ; C. B. Penrose, Esq., who appeared for the Middletown Bank ; Calvin Blythe, Esq., and W. Harris, Esq., who appeared for the Dauphin Deposit Bank ; William H. Rawle and William Rawle, Esquires, who appeared for R. H. Bayard ; and Mr. Wilson, President of the Farmers' Bank of the State of Delaware, who attended on behalf of the said bank.

" The execution above mentioned issued from this court in this case of Lombard and Whitmore *v.* Henry M. Bayard, whose real estate in Lancaster County was levied upon and sold by the marshal of this district to Ann Caroline Bayard, on the 9th day of April, 1847, for the sum of $ 61,200, subject to a mortgage of $ 18,000, the marshal's deed to which was acknowledged to the purchaser on the 15th day of April, 1847 ; and the sum of $ 61,200, the said purchase-money, is the sum considered in court, and mentioned in the said certificate marked A, and is the subject of reference to the undersigned.

" A list of the judgments hereto annexed, marked C, will exhibit the several claims upon the fund, which are stated in the said list in the order of their dates respectively. The question for examination respects the liens of these judgments ; and if the judgments in this court are liens upon the lands of the defendant situated in Lancaster County at the time of the sale, then the judgments are to be paid in the order of their dates, as stated in the list ; but if the judgments of this court are not liens on the said lands, then the judgments of Richard H. Bayard, of January 20, 1844, and those of Lombard and Whitmore, of July 25, 1845, and July 29, 1845, are to be postponed as to the fund for distribution.

" The case was submitted to the auditor without argument ; and having to depend upon his own research in ascertaining the law involved in the subject of inquiry, the defects that may be apparent in the view of the case now about to be submitted may be the more readily accounted for.

" It would seem that the lien of judgments on the real estate of defendants, obtained in the courts of the United States, was for a long time the subject of doubt. The first case, in point of date, that I have met with, is that of Konig *v.* Bayard, October term, 1829, 2 Paine's Rep., decided in the Circuit Court of the United States for the Southern District of New York. In

that case, it was held that the judgment created a lien upon the lands of the defendant, from the time it was docketed, according to the rule in the State courts; and that the lands of a debtor were liable to be taken in execution after they had passed into the hands of a *bonâ fide* purchaser, by a conveyance subsequent to the judgment, and prior to the issuing of the execution; and the principles upon which the judge founded his opinion may have weight in the present case.

"It was held, 'that the liability of lands to execution in the courts of the United States does *not* arise from any act of Congress expressly making them so liable, but from the operation of the process acts of 1789 and 1792; the State law upon the subject, being thereby adopted, should be considered as also adopting the effect and operation of the judgment as a lien. The repeated decisions in the courts of the United States, although they have not directly decided the point, had proceeded upon the presumption, that the lien created by a judgment in the United States courts upon land, and the mode of proceeding to obtain satisfaction of the judgments, are regulated entirely by the State laws. That Congress, by the process act, adopted both the form and effect of executions as established by the State laws in 1789. That their form and effect in this State [New York] depended upon the State act of 1787, which requires the sheriff to take the goods and chattels of the defendant, and, if sufficient cannot be found, then to make the debt and damages out of the land, &c., whereof the defendant was seized on the day on which such lands become liable to such debt. That the execution thereupon extends to, and operates upon, the lands of which the defendant was seized on that day; and that this was its effect, which had been adopted by the process act.'

"The next case, in point of time, that I have met with, is that of Tayloe *v.* Thompson, in the Supreme Court of the United States, 5 Peters, 35, decided in a case taken up under the laws of Maryland. It was contended for the plaintiff in error, that no statute of Maryland authorized the sale of lands for debt, and that the statute of 5 George II., antecedent to the Revolution, was the only legislation upon the subject. That that statute rendered lands in the Colonies subject to execution as chattels, and this only in favor of British merchants; and no execution having issued upon the lands in question before the title to them passed to the plaintiffs, consequently, as in the case of chattels, no lien attached upon the judgment.

"The court, in delivering their opinion, said,—'This statute (5 Geo. II.) has been adopted and in use in Maryland ever

since its passage, as the only one under which lands have been taken in execution and sold. It has long received an equitable construction, applying it to all judgment creditors. As Congress has made no law on this subject, the Circuit Court were bound to decide the case according to the law of Maryland; which does not consist merely in enactments of their own, or the statutes of England in force or adopted by their legislation. The adjudication of their courts, the settled, uniform practice and usage of the State, in the practical operation of its provisions, evidencing the judicial construction of its terms, are to be considered as part of the statute, and as such furnishing a rule for the decision of the Federal courts. The statute, and its interpretations, form together a rule of title and property, which must be the same in all courts. It is enough for this court to know that, by established usage, the statute (5 Geo. II.) has been acted on and considered as applying to all judgments in favor of any person ; and that sales made under them have been held valid as titles. Though the statute does not provide that the judgment shall be a lien from the time of its rendition, yet there is abundant evidence that it has always been so considered, and so acted on.' And the judge concludes by saying, that there was 'no doubt that the courts of Maryland had decided it as a rule of property from the earliest period, that a judgment is a lien *per se* on the lands of the defendant.' And, therefore, the lien of the judgment in the Circuit Court was sustained from the date of its rendition.

 "In the case of the Manhattan Company *v.* Evertson, 6 Paige, 465, the question that bore upon the doctrine of lien depended upon the question, whether a judgment in the United States Circuit Court for the Southern District of New York was a lien upon lands lying within the Northern District of the same State ; and in delivering his opinion the Chancellor says, — ' There is no act of Congress making a judgment in a court of the United States a lien on lands, either within the general territorial jurisdiction of the court, or elsewhere. The existence of such a lien must therefore depend upon the local law of the State where the land is situated upon which such a lien is claimed.

 " 'By the common law, a freehold could not be reached by a judgment, except in the case of an heir, upon a judgment bond, or other specialty. The statute of 13 Edward I., which gave the writ of elegit, by which one half of the land of the judgment debtor might be taken in extent, did not, in terms, create a lien, so as to prevent a sale by the debtor before execution ; but the uniform construction of the statute has been, to give such a lien, from the entry of the judgment, upon the lands

which could be reached by the process of the court. And when the British statute of 5 George II., ch. 7, subjected lands in the Colonies to sale on execution, the same principle was adopted in the Colony of New York, and in most of the Colonies, as to the lien of the judgment upon real estate which might be thus sold ; and this lien was held to extend to all freehold lands which could be reached by an execution out of the court in which the judgment was entered. And when a judgment was removed from an inferior into the Supreme Court, and there affirmed, such judgment became a lien upon all lands of the debtor throughout the State, from the time of the docketing of the judgment in the Supreme Court. Such was the state of the law here [New York] at the time of the Revolution.

"'The act of 1787, which was substituted in the place of the British statute subjecting lands to execution, recognizes the existence of such lien in the form of the execution which is directed by the statute to be issued against the lands of the debtor, as the sheriff is directed, in case the personal estate is insufficient to pay the judgment and costs, to levy the same on the lands and tenements whereof the judgment debtor was seized on the day the lands become liable, or at any time afterwards.

"'And that a judgment of a court of the United States is a lien upon the real estate of the debtor, in accordance with the local law of the place where the land lies, is settled by the Supreme Court. 5 Peters, 358.

"'Upon the principle which has been adopted by Congress, and by the Supreme Court of the United States, the legal effect of a judgment as a lien upon the real estate of a defendant, whether such judgment is rendered in a court of the State or in a Federal court, where no direction on the subject has been given by the sectional legislature, must necessarily be governed by the local law, although the mode of proceeding to enforce such lien, where it exists, may not be the same in the courts of the State and Federal courts. I have no doubt, therefore, that the lien of a judgment recovered in one of the Circuit or District Courts of the United States, within the limits of this State, is a lien upon the lands of the debtor lying within the territorial jurisdiction of such court, for the term of ten years from the docketing of such judgment, in the same manner that a judgment of a court of record in one of the State courts is a lien.

"'And the only difficulty is in determining whether the lien, according to the true principle of the local law, extends to all lands which may be reached by the execution of the court,

or only to such as are within the territorial jurisdiction to which the original process of such court extends.' And the Chancellor concluded by saying, 'but with some hesitation, that a judgment recovered in the Circuit Court, in either of the districts, is a lien upon real property lying in any part of the State within which the Circuit Court is held.' And he added, that, if a county court were authorized to issue execution throughout the State, the principle of the local law would extend the liens of the judgments thereafter recovered throughout the State; that such was the construction of Virginia, permitting execution upon a judgment in a local court to be issued to other counties; and cited 2 McCall, 186.

" In the case of Konig *v.* Bayard, heretofore referred to, the same doctrine is held, that the lien of a judgment upon the lands of a defendant existed by virtue of the right to take it in execution and sell it in satisfaction of the debt.

" The case of the United States *v.* Morrison, 4 Peters, 124, was taken up to the Supreme Court of the United States by appeal from the Circuit Court for the Eastern District of Virginia. The Chief Justice, in delivering the opinion, says, — 'In Virginia there is no statute which, in express terms, creates a lien upon the lands of the debtor. As in England, the lien is a consequence of the right to take out an elegit. Different opinions seem to have been entertained of the effect of any suspension of the right. By the construction of the Circuit Court, the party who sued out a *fi. fa.* could not resort to an elegit until the remedy on the *fi. fa.* was shown by the return to be exhausted'; that is, that the lien was suspended until the return of the *fi. fa.*, and the adverse right, having attached in the mean time, was preferred to that claimed under the judgment.

" But soon after the judgment in the Circuit Court, and before the case came up to be heard in the Supreme Court, the Court of Appeals of the State decided that the right to take out an elegit was not suspended by suing out a *fi. fa.*, and consequently, that the lien of the judgment was continued pending the proceedings on that writ. And upon the ground of this decision of the Court of Appeals, establishing the law of the State, the judgment of the Circuit Court was reversed, and the cause remanded; the Chief Justice observing, that ' this court, according to its uniform course, adopts that construction of the act which is made by the highest court of the State.'

" The above case recognizes the position, that where a lien is dependent upon the right to issue execution, and that right is suspended, the lien is suspended also; and is remarkable for the strong expressions used by the Chief Justice, in reference

to the deference paid by the courts of the United States to State laws.

" The Supreme Court, in the case of Tayloe *v.* Thompson, rather assign the local law of the State, recognized in its highest tribunals, establishing the lien of judgments, without special regard to the reasons by which it became established, as the ground of their decisions ; and in that case the judgment is held to be a lien *per se.*

" And in 4 Peters, 366, the Supreme Court have held, that in Kentucky a judgment does not bind land ; that the lien attaches only from the delivery of the execution to the sheriff ; and in that State, therefore, the right to issue execution does not carry with it a lien upon lands.

" In Ohio, the lien of a judgment is lost, if execution is not sued out and levied within a year from its rendition.

" In Tennessee, a judgment of a county court is a lien, for one year after its rendition, on defendant's lands throughout the State, and prior judgments take precedence of executions. Mart. & Yerg. 26.

" Judgments in the Circuit Court of the United States, in the State of Ohio, rendered previous to May, 1828, attached as liens upon the lands of defendant throughout the State, in virtue of the adoption by that court of the execution laws of the State in the regulation of its practice. Sellers *v.* Corwin, 5 Ham. 398.

" Here are presented a variety of local laws of different States on the subject of the lien of judgments, some derived from one principle and some from another ; and it may be remarked, that the statute of George II., the construction of which by the State courts of New York is the ground of the Chancellor's opinion above quoted, could have no application to any State formed since the Revolution, and after the States were colonies of Great Britain, to whom in that relation alone it applied. But hence the strong propriety of a broader ground of decision, on the part of the Federal courts, to adapt their proceedings to the local laws ; and this is comprehended in the view of the Supreme Court, taking the established law of the State as the basis of their judgments in matters of local character. And this ground of decision embraces all States, whatever may be the date of their creation or the peculiarity of their laws ; and this, I conceive, is the ground taken in the case of Tayloe *v.* Thompson, before referred to.

" It is not, however, deemed material in this case whether one principle or the other be adopted, as either will lead, it is believed, to the same conclusion, in accordance with the local laws of Pennsylvania.

"Antecedent to the act of the Pennsylvania Legislature of 1799, a judgment in the Supreme Court of the State was held to bind the lands of the defendant throughout the State; and the powers of the Supreme Court were held to be the same as those of the Court of King's Bench in England; and that, the liens of judgments in the latter court being only bounded by its territorial jurisdiction, those of the former had equal extent. That act, however, provided that no judgment of the Supreme or Circuit Court of the State should be a lien on real estate, excepting in the county in which such judgment should be rendered. Purd. Dig. 432.

"This is the only act of the Pennsylvania Legislature fixing territorial limits to the lien of judgments.

"There are several acts familiar to every one, fixing limits as to time, which, it is conceived, have no bearing on this case, and which, therefore, call for no special notice. The act of 1798, however, limiting the lien of judgments to five years, unless revived by *scire facias*, having been considered in this court, and the general argument having, as it is deemed, a bearing upon the question under discussion, will be presently noticed.

"The general doctrine of the lien of judgments has, however, been considered in the case of Krause's Appeal, 2 Whart. 402, in the Supreme Court of this State. In that case the court say, that 'neither the act of Parliament, which subjected lands, *sub modo*, to the payment of debts, nor our acts of 1700 and 1705, which made them liable to be sold absolutely, expressly provided that a judgment should be a lien on land. In both countries, however, it was held to bind land. Both there and here, it is expressly assumed by the legislatures of the different countries, and the time when the lien is to commence, and how long it is to continue, and by what proceeding prolonged, are expressly provided by different laws,' &c. We may content ourselves with saying, that a judgment is in Pennsylvania a lien on real estate, by acts of Assembly, and the nature and extent of the lien are according to the provisions of these enactments.

"In the case of Thompson *v.* Phillips, 1 Baldwin, 273, one of the questions considered by the Circuit Court was, whether the State law of 1798, limiting the lien of judgments on real estate to five years, was obligatory upon the Federal courts, and it was held that it was, for a variety of reasons. 'The terms of the act,' it was said, 'extend to all judgments,' in any court of record, 'within this State, and are broad enough to take in those of this court. Its object is declared to be to pre-

vent the risk and inconvenience to purchasers of real estate, by suffering judgments to remain a lien for an indifferent time, without any process to continue or revive the same, which applies in whatever courts such judgments are rendered. We cannot consider it as a mere process act; it is a part of a great system of jurisprudence, for the safety and protection of purchasers, &c. The questions arising under it are those of property, title, and the rights of purchasers for a valuable consideration. It cannot be doubted that this law should be the rule of decision in a State court, and it is difficult to perceive a reason why a different rule should be adopted in this court, merely because the plaintiff, being a citizen of another State, may bring his suit here or in the State courts, at his option. Both the courts administer the laws and jurisprudence of the State; the rules of property and title are the same, as well as the modes of transmission by judicial process; all regulated by State laws, there ought to be one uniform course of adjudication upon them.' ' That over the subject-matter Congress possesses no constitutional jurisdiction, nor has, in any manner, assumed its exercise. These are subjects of internal police and State regulation, over which the States have delegated no power to the general government; on which the States can legislate to any extent, and in any manner not prohibited by the constitution of the State or the Union.' And the judge affirmed that the case came strictly within the thirty-fourth section of the Judiciary Act.

"Although the argument of the court in the above case is applied to a question of limitation as to time, yet it is apprehended that its general doctrines are as applicable to a limitation in reference to territory as to that of time. A restriction imposed upon the lien of a judgment as to territory would enter as fully into questions of property, title, and the rights of purchasers, as that of a restriction as to the period of its duration; and therefore, if the local law is the rule of decision in the one case in the Federal courts, no reason is perceived why it should not be in the other.

"But a State legislature can impose no rule upon a Federal court, directly or indirectly, that cannot be sustained by the Constitution of the United States. Such legislatures have full power over their own tribunals, where it is not controlled by the State constitution, and they may enact what rules they please for their government within this limit; and if they were to abolish liens on real estate altogether, obtained through the medium of judgments, I apprehend the United States courts, in accordance with the doctrines of the cases quoted, would be

bound by it. But if a State were to restrict the liens of all judgments obtained in courts of record to the counties in which they were recovered, it might well be doubted if the Federal courts would be bound by such enactment, literally construed; for, in that case, the lien of a judgment in these courts would be excluded from every county composing the district except that in which the court might be located. This, therefore, would form a different rule for the Federal courts from that which would operate upon the State courts. The rule in the supposed case, it may be observed, can have no reference to locality, as distinct from the jurisdiction intended to be acted upon, and the term *county*, used in this connection, would be deemed merely a word used to designate the known limits of a given jurisdiction, and would, by applying the rule instead of a particular word to the Federal courts, embrace the district. If such would not be the construction, there would be no uniformity of decision between the Federal courts and those of the State, and the evils pointed out in the case in 1 Baldwin, 273, as likely to arise out of a collision between the State and Federal tribunals would be without remedy. The State laws cannot be made to have any special and direct bearing upon the United States tribunals. The latter merely administer the laws of the State as they find them, and because they are the laws of the State; but a law that would operate upon a Federal court exclusively, so as to restrain its action or the efficacy of its judgments beyond the restraints imposed upon the State courts, could scarcely be called a State law; and it might well be doubted if there would be any obligation upon the Federal courts, either under the thirty-fourth section of the Judiciary Act, or any acknowledged principle, to observe its provisions. This is, however, supposing a difficulty that does not exist.

"But it appears that Congress has legislated upon the subject of liens, so far as to designate the period when liens on judgments shall cease. By the act of July, 1840, c. 20, § 4, it is provided, 'That judgments and decrees thereafter rendered in the Circuit and District Courts of the United States, within any State, shall cease to be liens on real estate, or chattels real, in the same manner and at like periods as judgments and decrees of the courts of such State now cease by law to be liens thereon.'

"These words may be broad enough to comprehend liens in either relation, as regards territory or duration, but the word 'now' used in the act, according to the construction given to the Process Act in the Federal courts, would confine its action to the state of things in the several States to which it refers as existing at the time of its passage.

Bayard *v.* Lombard et al.

"However this may be, the act clearly recognizes the existence of liens on judgments in the Federal courts, and as it requires that they shall cease in conformity to the State laws, it is just to infer that, in the contemplation of Congress, they exist in conformity to the same laws, and in this recognizing the doctrine held by the courts.

"The foregoing decisions have a bearing on the case under consideration too obvious to call for any remark; and what remains to be said may therefore be said very briefly.

"As regards Pennsylvania, the statute of 5 George II. was never in force that I can ascertain. The act of 1705, passed by the local legislature, was in existence, and had been for several years before the passage of the former act, and superseded it. No local laws existing in the Colonies of New York, Virginia, Maryland, and others, the British statute became the law, and the construction it received varied more or less in the several jurisdictions. How far the doctrine of lien, as it grew up in Pennsylvania, was dependent upon the construction given in England to the statute of 1 Edward I., which gave the writ of elegit, I am not able to trace. But that a judgment in Pennsylvania has been uniformly held to be a lien *per se*, liable to no suspension or interruption from any cause short of satisfaction, or its equivalent in law, for a very long time, admits, I think, of no doubt.

"We therefore find, that the judgments of courts of record of the several States have liens attached to them binding real estate, but having their origin in different sources, and therefore varying in their effects; and that the local law is universally adopted in the Federal courts in the decision of local questions, and especially those having connection with real estate; and that the grounds upon which the local laws have been adopted have varied. In Ohio, judgments of the Federal courts are held to be liens, because these courts have adopted the execution laws of the State. In New York, Virginia, and other States, because of the operation of the Process Act; and in Maryland, because a judgment is a lien *per se*.

"Is Pennsylvania an exception to this otherwise universal rule? The only statutory limitation of the liens of judgments in Pennsylvania, as regards territory, is the act of 1799, which has been heretofore referred to, and that act is confined in its operation expressly to the Supreme and Circuit Courts of the State, and cannot be extended, by any construction, so as to affect such liens on the judgments of any other courts.

The case of White *v.* Hamilton held the doctrine, that the lien of judgments in the Supreme Court extended throughout

the State, because the jurisdiction of the court was thus extensive. The same rule has been adopted with regard to all other courts of record of the State, without any special legislation in reference to the subject of liens, but as an incident to the jurisdiction. In all the county courts, there is no other reason perceived why judgments obtained in them are liens throughout the county, but the fact that their jurisdiction extends throughout the county. The mere act of creating a court of record, and specifying the limits of its jurisdiction by State authority, extends the liens of judgments throughout these limits; and the application of the same rule to the Circuit Courts of Pennsylvania must, in accordance with received principles, be attended with like results.

"If this is not the rule in the case under consideration, what is the limit as to territory of the lien of a judgment in the Federal courts of this State? That a lien of some extent attaches upon such judgment has been shown by the authority of decided cases, and by fair inference from acts of Congress. What, then, is its territorial extent? Philadelphia County, where this court holds its sessions, is no more specially within its jurisdiction than Lancaster County, or Berks, or Northampton, or any other county of the district. They are all alike, and equally within the territory assigned to the jurisdiction of the court, and to every intent and purpose are equally within its judicial action; and the same cause of argument that would go to exclude the lien of a judgment of this court from Lancaster County, would exclude it from every county of the district, or, in other words, would extinguish it.

"Nor is it readily perceived how a lien on land can be obtained in Pennsylvania through judicial action, unless it attach upon a judgment. In 1 Baldwin, 268, the judge, in distinguishing between the effect of an execution, in its operating as a lien on real or personal estate, says, — 'As to land, the lien attaches by the judgment, and remains, though no levy be made. The sheriff has no right to take possession, or to enter upon it to make a levy; and after levy, he has neither the right of possession, of property, or power to sell an estate of freehold in defendant, if the property be improved,' &c. So in 1 Peters, 386, it is held, that 'the lien by a general judgment on land gives the right to levy on the same, to the exclusion of adverse interests; and such levy, when made, relates back to the time of the judgment.'

"If land can only be levied by virtue of the lien obtained through the judgment, then the existence of the lien is necessary to sustain the levy; and if the doctrine be true, that no

lien attaches upon a judgment of this court, or that such lien does not extend to Lancaster County, then was there nothing to sustain the execution on which the land was sold, and the money raised, which is now the subject of controversy, and the whole proceedings in that connection are void.

" And it may be added, that all the reasons alleged for adopting the local law of lien by the Federal courts apply to judgments in this case. For, 1st, the courts have adopted the execution laws of this State, as fully as in Ohio, where this is the ground alleged for adopting the lien law of that State; 2d, the Process Act applies as entirely to Pennsylvania as to New York and Virginia; and, 3d, a judgment in Pennsylvania is as much a lien *per se*, and forms a rule of title and property in this State, as in Maryland, and is therefore within the provisions of the thirty-fourth section of the Process Act, which is the reason assigned for adopting the lien law of the latter State.

" The auditor, therefore, is of opinion, that the authorities quoted sustain the position, that a judgment of this court is a lien upon the lands of the defendant in Lancaster County; and therefore, that the judgment creditors having prior liens are entitled to the fund in court, after payment of the costs and expenses upon the judgments as far as they may be covered by the fund, and the expenses of this reference. The judgments to be paid according to their priority, without regard to the court in which they were recovered, as follows, to wit : —

1845, June —. Judgment in the District Court of Lancaster County in favor of the President, Directors, and Company of the Bank of Pennsylvania, entered at December Term, 1841, revived to June term, 1845, for . . . $ 24,100.00  
Interest to 9th April, 1847, the day of sale.

1844, Jan. 20. Judgment in the Circuit Court of the United States for the Eastern District of Pennsylvania, in favor of Richard H. Bayard, Jan. 20, 1844. Judgment for . . . $ 17,188.00  
Interest to 9th April, 1847, the day of sale.

1845, July 25. Judgment of Lombard and Whitmore, in the same court. Judgment obtained July 25, 1845, for . . . . . $ 24,104.57  
Interest to 9th April, 1847, the day of sale.

1845, July 29. Judgment in favor of the same plaintiffs, in the same court. Judgment obtained July 29, 1845, for . . . . $ 10,000.00

1845, Aug. 26. Judgment in favor of the Bank of

Bayard *v.* Lombard et al.

Middletown, in the District Court of Lancas-
ter County, August 26th, 1845

1845, Aug. 28. And another judgment in favor of.
the same plaintiff, in the same court, obtained
August 28, 1845.

The amount due on both the above judgments,
as ascertained by the parties, is . . . . $ 26,550.47

But from this amount must be deducted any in-
terest allowed in the settlement of the amount, be-
tween the 9th April and 9th July, 1847, on which
last-named day the settlement is dated.

1845, Aug. 28. Judgment in favor of the Dauphin
Deposit Bank, in the District Court of Lancas-
ter County, obtained 28th August, 1845, for . $ 2,500.00
Interest to 9th April, 1847.

1845, Aug. 30. Judgment in favor of the Presi-
dent, Directors, and Company of the Farmers'
Bank of the State of Delaware, obtained in
the Court of Common Pleas of Lancaster
County, for . . . . . . . $ 12,000.00

Judgment obtained August 30, 1845.

Interest from August 30, 1845, to 9th April,
1847.

" All of which is respectfully submitted.

" JAMES HEPBURN, *Auditor.*"

Afterwards, on the same day, exceptions to the auditor's re-
port were filed, which exceptions are in the words following,
to wit : —

" On behalf of the Bank of Middletown and the Farmers'
Bank of Delaware, we except to the report of the auditor in
this case, on the ground that the auditor has erred in deciding
that the judgments rendered in this court are a lien on the lands
of the defendant in Lancaster County, Pennsylvania, and in
awarding the proceeds of the sale of such lands to said judg-
ments, to the exclusion of the judgments of record in the courts
in Lancaster County.

" B. H. BREWSTER,
CHARLES B. PENROSE,
*Attorneys for Bank of Middletown and Farmer's
Bank of Delaware.*"

" George W. Harris excepts to the report of the auditor, in
the case above referred to, in awarding the money in dispute,

in the said case, to the judgments obtained in the Circuit Court against Henry M. Bayard, instead of the judgment of the Dauphin Deposit Bank against the said Henry M. Bayard, in the District Court of the County of Lancaster, the same being No. 135 of June term, 1845.

"GEORGE W. HARRIS,
*Attorney for the Dauphin Deposit Bank.*

"*September, 20, 1847.*"

On the 11th of October, 1847, the exceptions were argued, and overruled by the court. The report was confirmed, and distribution ordered in accordance therewith.

The counsel for the Bank of Middletown then moved the court to allow the entry of an appeal from the order of the court distributing the proceeds of the execution in this case; which motion, after the hearing of counsel, was overruled by the court.

The counsel then filed an affidavit, made by Simon Cameron, the cashier of the bank, that the appeal was not intended for delay; and caused Simon Cameron and Alexander Cumming to enter into a recognizance for the prosecution of the appeal with effect. The following note was attached to it by the presiding judge, viz.: —

"N. B. — The above affidavit and recognizance have been sworn and acknowledged before me, at the request of counsel, *valeant quantum valeant*, the court having previously refused, on motion of said counsel, to allow an appeal, on the ground that the party offering to appeal was not entitled to such remedy.

"*October* 30, 1847. R. C. GRIER."

On the 15th of November, 1847, Mr. Penrose moved that a final decree or order be entered, which motion was overruled by the court.

On the 17th of November, 1847, the following præcipe for a writ of error was filed, viz.: —

"HENRY M. BAYARD, a Citizen of Pennsylvania, Plaintiff in error, *v.* ISRAEL LOMBARD and CHARLES O. WHITMORE, Citizens of Massachusetts, &c., Defendants in error.

"Sir, — Issue writ of error to the Circuit Court of the United States for the Eastern District of Pennsylvania, to remove the record and proceedings in the suit or action wherein the said Israel Lombard and Charles O. Whitmore, citizens of the State of Massachusetts, copartners under the firm of Lombard and

46 *

Whitmore, &c., are plaintiffs, and Henry M. Bayard, a citizen of the State of Pennsylvania, is defendant, No. 28, April session, 1845, including all the final process issued therein, and the proceedings thereupon, and particularly the decree of the said Circuit Court making distribution of the money raised by the sale of the real estate of the defendant, the said Henry M. Bayard, and also the costs taxed therein, the appeal therefrom, the exceptions filed thereto, and the order of the court thereupon.

"*Nov. 17th,* 1847.                          B. H. BREWSTER,
                                                  CHAS. B. PENROSE,
                         *Att'ys for Plaintiff in error, and of the Bank
                            of Middletown, and the Farmers' Bank of
                            the State of Delaware.*

"GEORGE PLITT, ESQ., *Clerk of Circuit Court United States,
    E. D. P.*"

An affidavit and recognizance were filed on behalf of the Bank of Middletown, to which a memorandum was attached, similar to the one just mentioned.

Upon the writ of error thus issued, the case came up to this court.   The following assignment of errors was filed.

### *Errors Assigned.*

1. The court erred in confirming the report of the auditor in this case, and in ordering distribution according to that report.

2. The court erred in ordering distribution of the fund raised by the sale of real estate, in Lancaster County, to be made to judgments entered of record in the said Circuit Court, in the County of Philadelphia, instead of to the judgments in favor of the Bank of Middletown and the Farmers' Bank of Delaware, respectively entered of record in the County of Lancaster, which were liens on the land sold.

3. The court erred in assuming jurisdiction to make an order for the distribution of the fund, raised by the sale of the real estate of the defendants below, among the judgment creditors of the defendants, some of such creditors having judgments of record in the State courts of the County of Lancaster, and in refusing to the Bank of Middletown, one of these creditors, an appeal to the Supreme Court of the United States, under the act of the General Assembly of the Commonwealth of Pennsylvania, passed the 16th April, 1827, entitled "An act relative to the distribution of money arising from sheriffs' and coroners' sales," &c., which gives such jurisdiction to State courts.

4. The court erred in overruling the exceptions to the costs

taxed by the clerk of the court, and in allowing the sum of two hundred and fifty dollars to the auditor, and a commission to the clerk on money not deposited in court, amounting to the sum of                , to be deducted from the fund.

5. The court erred in refusing to enter a final decree in the case.

Filed 7th January, 1848.

The case was argued by *Mr. Brewster*, for the plaintiff in error, and *Mr. John M. Read*, for the defendants in error.

Both the counsel went into an elaborate investigation of the nature and extent of a lien upon land created by a judgment in the Circuit Court; but as the decision of this court rested upon a collateral point, it is not deemed necessary to take further notice of these arguments. The right of appeal was more briefly discussed.

*Mr. Brewster*, for the plaintiff in error, thus noticed that point.

The fifth exception is, that the court erred in refusing to enter a final decree in the case.

The plaintiff in error contends that the decree rendered in this case was in the nature of a final and absolute decree and judgment, and as such upon it a writ of error or an appeal will lie, under the twenty-second section of the statute of 1789. In Pennsylvania, at one time, by the practice of our courts, when the sheriff was ruled to pay into court money arising from the sale of real estate, all disputes between conflicting claimants were heard by the court itself; this becoming a burden upon the courts, they adopted the method of referring these questions to auditors, whose decisions were reported to the court by whom they were appointed; this continued till 1827, when the following statute was passed : —

" In all cases of sheriff's or coroner's sale, where there are or may be disputes about the distribution of moneys arising therefrom, the respective Courts of Common Pleas, District Courts, and Courts of Nisi Prius within this Commonwealth, are hereby declared to have full power and authority to hear and determine all such cases according to law and equity." Act of 16th April, 1827, Pamph. Laws, 471.

By this statute, if an issue in fact was raised and tried by a jury, the judgment in the issue was subject to a writ of error, and if decided by the court without the intervention of a jury, the party aggrieved by the decision might appeal to the Supreme Court.

The court in this very case adopted ·the method of practice used in the State courts under this· statute of 1827, and by appointing an auditor to distribute the money, they have incorporated the provisions of the statute into their code of practice, and, as the plaintiff alleges, thereby adopted the·whole of the statute, which, as has been before said, gave a writ of error and an appeal to the Supreme Court of the State.    That statute of Pennsylvania in effect makes such a decree of the.court a final judgment, and as the parties and their rights are concluded˜ by it, they are entitled to the advantage of a hearing in a court of review.    The act of Congress of 1828 authorizes this adoption of our State practice, and by its adoption the Pennsylvania· act of 1827 has become a part of the law of the Circuit Court. Mayberry v. Thompson, 5 Howard, 126 ; Boyle v. Zacharie, 6 Peters, 648.

*Mr. Read*, for the defendants in error, contended that the case was not regularly before this court.

1. It is not here by appeal, nor are either of the banks in any manner parties in this court.    This has been already stated.

2. A writ of error does not lie to the distribution of money under the sale of a marshal.    This was the settled law of Pennsylvania prior to the act of 1827.    17 Serg. & Rawle, 278.

The defendant below has no error to complain of, because his property is paid to his creditors in discharge of their debts, and it is immaterial to him in point of law which one is paid in preference to the other.

No judgment creditor can sustain a writ of error, because he is not a party to the suit, which is a common law proceeding. Therefore, neither the Bank of Middletown nor the Farmers' Bank of Delaware could bring this writ of error, nor are they in any manner parties thereto.

These points are made as a matter of duty to the court, but the defendants in error have the fullest reliance on the correctness of the decision of the Circuit Court upon the real question in the cause.

Mr. Justice GRIER delivered the opinion of the court.

This case has been brought here, both by writ of error and appeal, for the purpose of reviewing the decision of the Circuit Court for the Eastern District of Pennsylvania, with respect to the lien of judgments obtained in that' court.    But as we are of opinion that the ruling of the Circuit Court on this subject is not properly before us on the record, we cannot consent to

volunteer an expression of our judgment upon it, however much it may be desired by the parties.

A brief statement of the history of the case, and of the peculiar practice of the courts of Pennsylvania on this subject, will make it apparent that the decision of the court below involving this question is not properly before us, either by the appeal or the writ of error.

The record shows, that Lombard and Whitmore obtained a judgment against Bayard, the nominal plaintiff in error in this case, on a bond for $62,420, conditioned for the payment of $31,210. An execution on this judgment was issued, returnable to April term, 1846, on which the marshal returned a levy on certain lands of the defendant situate in Lancaster County, and within the Eastern District of Pennsylvania. An inquisition was held, and the property condemned, according to the practice and laws of that State. A *venditioni exponas* was afterwards issued, on which the marshal returned, that he had sold the property levied on for the sum of $61,200. These proceedings are admitted to be all regular, and according to law.

In Pennsylvania, a judicial sale discharges the land sold from all liens, except (now) prior mortgages. When, therefore, land is once sold on execution, and converted into money, all persons who claim to have liens upon it by judgment or otherwise (with a few exceptions) are compelled to follow the money or lose their security. Hence it often happens that, when money is made by sale of land on a junior judgment, the plaintiff does not obtain satisfaction, and is sometimes involved in a fresh litigation with creditors claiming to have prior liens. In these contests the defendant is usually an indifferent spectator. For many years there was no settled practice as to the mode in which these new disputes should be litigated.

In some districts the sheriff paid the money in his hands to such parties as he thought best entitled to it, and took an indemnity against other claimants, who were thus compelled to seek their remedy by suit on his bond. In other districts, the sheriff avoided responsibility by paying the money into court, and leaving the claimants to settle their controversies in such manner as the court might order, or the parties elect. In such cases, the court usually disposed of the money on the motion of the parties interested, by ordering the liens to be paid in the order of their priority, as certified by the clerk. But as it not unfrequently happened that the junior judgment creditors contested the validity of the lien of the older judgment, because it was not regularly revived, or for other reasons; or challenged

it for fraud and collusion; or insisted that it had been paid in whole or in part, it became necessary that the court should in some way try and decide these questions thus raised by new parties before any proper disposition could be made of the money. In such cases, where the counsel expected questions to arise which they might desire to have reviewed by writ of error, they took care, by the form of an amicable action, or by case stated in the nature of a special verdict, to shape the proceedings in such form and with such parties that a writ of error would lie in favor of those who felt aggrieved by the decision of the court.

But it was conceded by all, that, if the money was distributed by the court on motion, a writ of error could not reach the proceeding, and the decision of the court was conclusive on all parties. (See Gratz v. Lancaster Bank, 17 Serg. & Rawle, 279.)

Such was the practice in the courts of Pennsylvania, till the year 1827, when an act of Assembly was passed, requiring the court to direct an issue in such cases, at the request of any claimant, and to give notice to all persons interested; and allowing a writ of error where the issue was tried by a jury, and an appeal when the question was submitted to the court.

In the case before us, the marshal paid the money into court, and motions were made by the Bank of Middletown and others for leave to take it out of court, which were resisted by Lombard and Whitmore, the plaintiffs in the judgment. The court appointed an auditor to make report as to the parties entitled to the money, with directions to give notice to all parties concerned. The auditor made a report, giving a preference to the judgments according to their priority in time. The Bank of Middletown, and others who had junior judgments in the State courts of Lancaster County, excepted to the report, alleging that judgments in the Circuit Court of the United States were not liens on the lands of defendant in Lancaster County, or out of the County of Philadelphia.

This exception was overruled by the court, and the report of the auditor confirmed. From this decision of the court the Bank of Middletown appealed, and on suggestion of a doubt by the court whether an appeal would lie, a writ of error was also sued out by counsel professing to act " as attorneys for plaintiff in error, and for the Bank of Middletown and the Farmers' Bank of Delaware."

But no errors have been assigned in this court, to the judgment or execution, on behalf of the plaintiff in error. As against him, all the proceedings are admitted to be regular and

legal. It is a matter of indifference to him whether the money raised by the sale of his lands on the execution is awarded to defendants in error or to the banks. The assignment of errors in this case is on behalf of persons who are not parties to the record, and of a matter arising after execution executed, on a motion by strangers to the judgment and proceedings, and an order of the court disposing of certain funds in their possession accidentally connected with this record.

It is a well settled maxim of the law, that "no person can bring a writ of error to reverse a judgment who is not a party or privy to the record." "A writ of error lies when a man is grieved by an error in the foundation, proceeding, judgment, or execution" in a suit. Co. Lit. 288, *b;* see also Boyle *v.* Zacharie, 6 Peters, 655, and cases cited. The judgment or order of the court on a summary motion, or a collateral question arising like the present on the suggestion of a third party, is not reexaminable on a writ of error issued on the judgment with which it may happen to be connected.

The Circuit Court of the United States has adopted the forms of process in execution of the State courts, and the laws and practice of Pennsylvania, for taking lands on execution and disposing of their proceeds. But it is not a consequence of their adoption of them that the modes of reviewing the decisions of the Circuit Court by this court should be conformed to the laws or practice of the State. For it cannot be pretended that acts of Assembly of Pennsylvania can give jurisdiction to this court not to be found in the Constitution and acts of Congress of the United States.

The absence of courts of equity in Pennsylvania has compelled them to adopt modes of practice in their courts of common law anomalous in their character, and unnecessary in a court possessing the full powers of a court of chancery. An appeal to this court is given in chancery cases alone. And the writ of error given by the Judiciary Act is governed by the provisions of that act and the principles of the common law, as regards the judgments and questions which may be reviewed under it. The persons complaining in this case should have filed their bill in equity, or stated an issue in due legal form, with proper parties, setting forth the merits of their respective claims, if they intended to prosecute an appeal or writ of error to this court. This could have been done with less expense and trouble, and in less time, than in the mode pursued. But having submitted the question on which their claim depended to the court below, on a motion collateral to the record, the decision of that court is final and conclusive, and cannot be reviewed by this court.

Therefore, as no error appears on the record, the judgment of the Circuit Court must be affirmed.

### *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.